# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3498

_____

The Doe Run Resources Corporation

*Plaintiff - Appellant*

v.

Lexington Insurance Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 11, 2013
Filed: June 13, 2013

_____

Before LOKEN and GRUENDER, Circuit Judges, and WIMES[*], District Judge.

_____

LOKEN, Circuit Judge.

Doe Run Resources Corporation ("Doe Run"), the largest integrated lead producer in the Western Hemisphere, operates facilities near Leadwood, Missouri, that extract and crush ore containing lead and other metals and process the crushed

_____

[*]The Honorable Brian C. Wimes, United States District Judge for the Western District of Missouri, sitting by designation.

ore to separate out lead concentrate that Doe Run sells on the world market or transports to its smelters for further processing. Doe Run initially deposits the remaining material -- chat, which has the consistency of gravel, and tailings, which have the consistency of sand -- into a five-hundred-acre waste pile referred to in this litigation as the Leadwood Pile. Doe Run periodically takes chat and tailings from the Leadwood Pile for commercial use or sale, for example, as agricultural lime, deicing materials, or construction materials.

Lexington Insurance Company ("Lexington") issued Commercial General Liability policies (the "Lexington Policies") insuring these Doe Run operations during the period in question. Doe Run commenced this declaratory action seeking to enforce Lexington's duty to defend Doe Run in two underlying lawsuits seeking damages arising out of Doe Run's operation of the Leadwood Pile, which we will refer to as the "Briley Lawsuit" and the "McSpadden Lawsuit." Doe Run appeals the district court's grant of summary judgment dismissing the action on the ground that the absolute pollution exclusions in the Lexington Policies unambiguously bar coverage, and therefore the duty to defend, for both underlying suits.

In Doe Run Res. Co. v. Lexington Ins. Co., No. 12-2215, -- F.3d -- (8th Cir. 2013) ("Doe Run I"), these same parties litigated Lexington's duty to defend another underlying lawsuit seeking damages for Doe Run's separate mining and milling operations near Viburnum, Missouri. In that case, the parties briefed the same arguments for and against coverage and the duty to defend; we upheld the district court's decision that the pollution exclusions barred the duty to defend. We refer the reader to that opinion for additional background information and a fuller description of the Lexington Policies, the applicable law, and the parties' arguments.

Determination of whether Lexington has a duty to defend the Briley Lawsuit and the McSpadden Lawsuit requires detailed comparisons of the allegations in those underlying complaints with the applicable pollution exclusions. McCormack Baron

Mgmt. Servs., Inc. v. Am. Guar. Liab. Ins. Co., 989 S.W.2d 168, 170 (Mo. 1999). Having conducted this *de novo* review, we conclude that the pollution exclusions preclude a duty to defend Doe Run in the Briley Lawsuit, but not in the McSpadden Lawsuit. Accordingly, we affirm in part, reverse in part, and remand.

## I. Procedural Background

The Briley Lawsuit was filed in September 2009 on behalf of a class of minors seeking damages for Doe Run's tortious release of lead and other toxic chemicals from the Leadwood Pile. On November 4, 2009, Doe Run timely sent Lexington a letter tendering defense of the Briley Lawsuit. Lexington denied coverage in a lengthy letter from its account specialist dated January 22, 2010. Doe Run filed this action in October 2010, seeking a declaration that Lexington has a duty to defend Doe Run in the Briley Lawsuit.

In April 2010, twenty individual plaintiffs (all but one a minor) filed the McSpadden Lawsuit seeking damages for Doe Run's tortious operation of the Leadwood Pile. Though the same attorneys filed both underlying actions in the same state court on behalf of similarly-aged clients, the claims alleged in the McSpadden complaint were not, as we will explain in greater detail, entirely the same as the claims alleged in the Briley complaint. Again, Doe Run timely tendered defense of the McSpadden Lawsuit on April 16, 2010. Lexington acknowledged the demand on May 17 but did not respond. On March 30, 2011, Doe Run amended its complaint in this action to seek a declaration that Lexington has a duty to defend both the Briley Lawsuit and the McSpadden Lawsuit. Lexington denied a duty to defend the McSpadden Lawsuit in a June 2011 letter that explained:

> Plaintiffs allege that mining waste containing lead and other toxic substances was released from chat and tailings piles within Leadwood Pile that caused them to suffer various injuries, damages, and losses.

Coverage for the above lawsuit is denied under the total pollution exclusion (G.) contained in [the Lexington Policies].

The parties filed cross motions for summary judgment addressing the pollution exclusion issue in January 2012.

## II. The Briley Lawsuit

As in Doe Run I, we quote extensively from the complaint in the Briley Lawsuit because the duty to defend normally "is determined by comparing the language of the insurance policy with the allegations in the [underlying] complaint." McCormack, 989 S.W.2d at 170. The named plaintiff in Briley alleged, *inter alia*:

1. This is an action to seek redress . . . for injuries, damages and losses suffered by the Plaintiff as a result of the release of metals and other toxic chemicals from the chat and tailings piles owned, operated, managed, supervised and used by [Doe Run] . . . ("the Leadwood Pile"). These damages and losses include but are not limited to the need for medical monitoring services for children arising out of their exposure to lead and other toxic substances released from the Leadwood Pile.

6. The Leadwood Pile . . . consists of an estimated 5,100,000 cubic yards of mine waste . . . . In addition to high residual lead content in this mining waste, other heavy metals including cadmium and zinc also are present. The Missouri Department of Conservation has detected elevated lead levels in fish downstream of the Leadwood Pile . . . .

7. Dust created by wind erosion and by activities occurring at the Leadwood Pile has and continues to contaminate the surrounding area posing a hazard to residents. . . .

9. During the course of its operations . . . the Leadwood Pile has released to the area beyond its boundaries, including the property on

which Plaintiff resided, metals and other substances, including but not limited to lead and cadmium, both negligently, carelessly and recklessly.

10. At all times relevant hereto, Doe Run has owned, operated, managed and used the Leadwood Pile and is responsible for the negligent, careless and reckless release of lead and other toxic substances to areas beyond the boundaries of the Leadwood Pile.

Following these General Allegations, the Briley complaint asserted four common law tort causes of action:

## COUNT I -- Negligence

26. [Doe Run] . . . negligently, carelessly and recklessly generated, handled, stored, treated, disposed of, and failed to control and contain the metals and other toxic substances at the Leadwood Pile, resulting in the release of toxic substances and exposure of Plaintiff and Plaintiff Class. [Doe Run] also negligently . . . failed to warn Plaintiff and Plaintiff Class of the release of the metals and other toxic substances into the environment and community surrounding the Leadwood Pile and of the reasonably foreseeable effects of such releases.

## COUNT II -- Absolute or Strict Liability

31. The handling and processing of metals and other toxic substances at the Leadwood Pile . . . constitutes an abnormally dangerous activity or ultra hazardous activity, because such activities create a high risk of significant harm.

33. The collection, handling and processing of hazardous wastes and toxic substances at the Leadwood Pile has directly and proximately caused release of such substances into the environment and the community surrounding the Leadwood Pile.

-5-

34.  As a direct and proximate result of the releases from the Leadwood Pile . . . the Plaintiff and the Plaintiff Class . . . will continue to suffer . . . injuries, damages and losses. . . .

## COUNT III -- Private Nuisance

37.  [Doe Run's] conduct at the Leadwood Pile . . . constitutes an unreasonable interference with the use and enjoyment of the property on which the Plaintiff and members of the Plaintiff Class resided by releasing heavy metals and other toxic substances from the Leadwood Pile onto Plaintiff's property and the property of the members of Plaintiff Class.

## COUNT IV -- Trespass

41.  [Doe Run's] conduct at the Leadwood Pile . . . has resulted in an entry and intrusion onto the property on which Plaintiff and members of the Plaintiff Class resided by the transport and deposition of emissions from the Leadwood Pile without permission.

42.  The entry and intrusion by Defendants has caused and continues to cause damages to Plaintiff and the Plaintiff Class.

43.  As a direct and proximate result of the releases from the Leadwood Pile, the Plaintiff and the Plaintiff Class . . . will continue to suffer . . . injuries, damages and losses. . . .

Like the allegations in every cause of action asserted in the underlying complaint in Doe Run I, every tort cause of action asserted in the Briley Lawsuit was *entirely* premised on allegations that Doe Run is liable for causing the "release" of "hazardous wastes" and "metals and other toxic substances" from the Leadwood Pile, thus mirroring the language of Lexington's absolute pollution exclusions. Indeed, the Briley complaint described the chat and tailings as mine wastes even more explicitly than did the underlying complaint in Doe Run I, allegations that made these materials, when inadvertently released into the surrounding environment, indistinguishable from

the wastewater treatment sludge at issue in Casualty Indemnity Exchange v. City of Sparta, 997 S.W.2d 545, 546 (Mo. App. 1999). For example, the trespass claim in paragraphs 40 through 44 alleged the "transport and deposition of emissions" onto other property, including land on which the Briley plaintiffs resided, based on allegations in fact paragraphs 9 and 10 that Doe Run "released" metals and other toxic substances beyond the boundaries of the Leadwood Pile. Paragraph 43 then alleged damages resulting from injuries caused by these "releases." Thus, the trespass claim, like the other causes of action asserted in the Briley Lawsuit, was a classic claim for damages caused by environmental pollution.

Doe Run argues, as it did in Doe Run I, that Lexington's pollution exclusions nonetheless do not apply as a matter of law. For the reasons explained in Part III of our opinion in Doe Run I, we again conclude (i) that the Missouri Court of Appeals decision in Hocker Oil Co. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d 510 (Mo. App. 1999), "does not mandate the conclusion that Lexington's pollution exclusions are ambiguous as applied to the [Briley] Lawsuit," slip op. at 10; and (ii) that deletion of a broad lead exclusion from the Lexington Policies issued after October 2004 "left the remainder of the CGL policy in full force and effect, including its absolute pollution exclusion," id. at 13. For these reasons, we agree with the district court that Lexington's pollution exclusions unambiguously apply and therefore bar a duty to defend the Briley Lawsuit.

### III. The McSpadden Lawsuit

The complaint in the McSpadden Lawsuit, though similar or identical in many respects, included allegations not found in the Briley complaint, namely:

> 30. Additionally, throughout its existence, [Doe Run has] permitted the Leadwood Pile to be left open and available for use by the general public.

-7-

32.  Until on or about October 2009, no fencing or other physical barriers were in place around the Leadwood Pile.

33.  Until on or about October 2009, no warning signs addressing the dangers of exposure to lead at the Leadwood Pile were posted on or around the Leadwood Pile.

34.  Upon information and belief, the lead contaminated contents of the chat piles have been used extensively throughout St. Francois County as fill material and for use on roads, streets, alleyways, driveways, in the foundation of homes and/or other buildings, and for use in children's sandboxes.

COUNT I -- Negligence

38.  Additionally, [Doe Run] distributed and/or allowed for the distribution of chat containing dangerously high levels of lead and other toxic substances to the general public and/or surrounding community.

39.  Moreover, throughout its existence, [Doe Run] permitted the Leadwood Pile to be left open and available for use as a park by the general public.  The Leadwood Pile has been used by the general public, and by plaintiffs, for various recreational purposes.

42.  [Doe Run was] negligent in the following respects:

a.  In failing to control and contain lead and other toxic substances from the release and/or distribution to areas beyond the boundaries of the Leadwood Pile;

b.  In distributing and/or allowing for the distribution of chat containing dangerously high levels of lead and other toxic substances to the general public and/or surrounding community;

e.  In failing to control or attempt to control public access to the Leadwood Pile;

-8-

f.  In failing to place fencing or physical barriers around the Leadwood Pile;

g.  In failing to post signs warning of the danger of lead exposure on and around the Leadwood Pile; and

h.  In failing to make the community generally aware of the dangers posed by recreational use of the Leadwood Pile.

COUNT II -- Strict Liability for the Release of Toxic Substances

49.  Additionally, [Doe Run] distributed and/or allowed for the distribution of chat containing dangerously high levels of lead and other toxic substances to which plaintiffs were exposed into the stream of commerce and environment.

50.  The chat was put to foreseeable, reasonably anticipated and intended uses, including but not limited to filling sandboxes, use in the foundation of homes, and spraying on streets for the purpose of snow removal.

51.  The chat was in a defective condition and unreasonably dangerous when put to these reasonably anticipated uses . . . .

COUNT III -- Strict Liability for Allowing Public Access [to] the Leadwood Pile

57.  Allowing the area on and around the Leadwood Pile to be open and available for use by the general public and by plaintiffs constitutes an abnormally dangerous activity or ultra hazardous activity . . . .

59.  Additionally, [Doe Run] distributed and/or allowed for the distribution of chat and other substances containing dangerously high levels of lead and other toxic substances to which plaintiffs were exposed into the stream of commerce and environment by allowing public access on and around the Leadwood pile.

60. With unrestricted public access, the area on and around the Leadwood Pile was put to foreseeable, reasonably anticipated and intended uses, including but not limited to sledding, riding four-wheelers, riding dirt bikes, and general playing, similar to playing in the sand on a beach.

61. The area on and around the Leadwood Pile was in a defective condition and unreasonably dangerous when put to these reasonably anticipated uses . . . .

To the extent the McSpadden complaint alleged bodily injury or property damage resulting from the release of hazardous wastes or toxic substances, the pollution exclusions bar coverage of those claims for the reasons we discussed in Doe Run I and in Part II of this opinion. But "[t]he presence of some insured claims in the underlying suit gives rise to a duty to defend, even though uninsured claims or claims beyond the coverage may also be present." Lampert v. State Farm Fire & Cas. Co., 85 S.W.3d 90, 93 (Mo. App. 2002). The pollution exclusions in the Lexington Policies exclude coverage only for bodily injury or property damage "which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants."[2] Unlike the Briley complaint and the underlying complaint at issue in Doe Run I, the above-quoted portions of the McSpadden complaint were broadly pleaded and were *not* explicitly premised on an alleged release of hazardous wastes or toxic substances.

The McSpadden complaint alleged bodily injury and property damage from two causes that did not necessarily entail a "release" of hazardous wastes or toxic

[2]This quote is from the post-November 2004 policies. Substantially similar phrasing in the earlier policies also required a "discharge, dispersal, release, or escape" of "pollutants or contaminants." See Doe Run I, slip op. at 7, -- F.3d at --. Responding to questions at oral argument, counsel for Lexington agreed that, "If there's no release, there's no pollution exclusion."

substances, introducing those claims with the transitional words "additionally" and "moreover." First, plaintiffs alleged that Doe Run *distributed* chat and other toxic substances into the community for use "as fill material and for use on roads, streets, alleyways, driveways, in the foundation of homes and/or other buildings, and for use in children's sandboxes." "Distribute" is not among the transitive verbs that trigger the pollution exclusion. Furthermore, the distribution of material from the Leadwood Pile for use as a product is markedly different than the inadvertent "discharge, dispersal, seepage, migration, release or escape" of those waste materials. Unlike the "transport and deposition" allegations in the trespass claim of the Briley Lawsuit, these "distribute" allegations were not based upon the underlying factual premise of "releases"; alleged the distribution of material for use as a product, not the inadvertent release of pollutants; and were introduced with the transitional word "additionally." See Truck Ins. Exch. v. Prairie Framing, LLC, 162 S.W.3d 64, 82 (Mo. App. 2005) (imposing a duty to defend because the third party asserted claims that were independent of those falling within a policy exclusion).

The difference is illustrated by the City of Sparta decision. There, the "release" that triggered the policy's pollution exclusion did not occur when the City distributed wastewater treatment sludge to a farmer for use as a fertilizer. 997 S.W.2d at 546. Rather, the excluded release occurred when toxic substances contained in the sludge allegedly migrated to a neighbor's land, causing damage. Id. at 552; Doe Run I, slip op. at 10-11, -- F.3d at --. The McSpadden complaint alleged that the distribution of these materials harmed plaintiffs, without specifying how that harm occurred. A liability insurer has a duty to defend its insured when the underlying complaint "sufficiently alleges facts stating a claim *potentially* within the policies' coverage." Superior Equip. Co. v. Md. Cas. Co., 986 S.W.2d 477, 482 (Mo. App. 1998) (emphasis added); see Esicorp, Inc. v. Liberty Mut. Ins. Co., 193 F.3d 966, 969-70 (8th Cir. 1999).

Second, the McSpadden complaint alleged that Doe Run caused bodily injury or property damage when it left the Leadwood Pile "open and available for use by the general public" until October 2009 without posting "warning signs addressing the dangers of exposure to lead," allegations resembling an attractive nuisance claim against a landowner. Again, absent from these allegations was any reference to a release; plaintiffs alleged that they came to the pollutants. It may be that the only claim the McSpadden plaintiffs will be able to prove will be bodily injury or property damage caused by the *threatened* release of pollutants. In that event, the pollution exclusions will apply, and Lexington will have no duty to indemnify Doe Run if it is found liable. But the issue here is the broader duty to defend. Under Missouri law, "[t]he duty to defend arises whenever there is a potential or possible liability to pay based on the facts at the outset of the case and is not dependant on the probable liability to pay based on the facts ascertained through trial." McCormack, 989 S.W.2d at 170 (quotation omitted). Applying this principle, we conclude that the McSpadden Lawsuit includes allegations and claims that are not unambiguously barred from coverage by the pollution exclusions in the Lexington Policies. Therefore, unless another exclusion or defense not yet considered by the district court applies, Lexington has a duty to defend the McSpadden Lawsuit.

For these reasons, we affirm the grant of summary judgment insofar as it dismisses Doe Run's claims relating to the Briley Lawsuit, but we reverse the grant of summary judgment dismissing Doe Run's claims relating to the McSpadden Lawsuit as precluded by the pollution exclusions. The judgment of the district court is reversed in part, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

_____